Michael L. Lovitz (268976) Mlovitz@lovitziplaw.com
Lovitz IP Law PC
8335 W Sunset Blvd., Ste. 314
West Hollywood, CA 90069
Telephone:   (323) 337-9088
Larry Zerner (155473) Larry@zernerlaw.com
Law Offices of Larry Zerner
1801 Century Park East, Ste. 2400, L.A. CA 90067
Phone: 310-773-3623

Attorneys for Plaintiffs Platino Records, Inc., and Antoine Music, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Platino Records, Inc. and Antoine Music, Inc., <br><br> Plaintiffs, <br><br> vs. <br><br> Colonize Media, Inc., Yellowcake, Inc., Jose David Hernandez, Kevin Berger, and DOES 1-10, <br><br> Defendants. | Case no. 2:20-CV-3159 <br><br> COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES FOR: <br><br> 1. Copyright Infringement (17 U.S.C. § 101 *et seq.*); <br><br> 2. Breach of Contract; <br><br> 3. Copyright Online Misrepresentations Under 17 U.S.C. § 512(f); <br><br> 4. Intentional Interference with Prospective Economic Relations <br><br> DEMAND FOR JURY TRIAL (F.R.C.P. Rule 38) |

Plaintiffs Platino Records, Inc. and Antoine Music, Inc., (collectively, "Plaintiffs") complain of and allege the following:

**INTRODUCTION AND OVERVIEW**

1. This is an action for copyright infringement under the Copyright Act of 1976, Title 17 U.S.C. § 101 *et seq.*, seeking damages for all of Defendants' profits, all of Plaintiffs'

losses, payment of Plaintiffs' attorney's fees and costs, preliminary and permanent injunctive relief and an accounting, as well as damages and other relief based upon other claims related to the misappropriation of, and online material misrepresentations about, Plaintiffs' intellectual property.

2. Defendants' actions complained of herein include, *inter alia*, copyright infringement in connection with the unlicensed digital distribution by Defendants of certain sound recordings and videos owned by Plaintiffs and that Defendants have used Plaintiffs' works in furtherance of their business, without license, permission or authorization, all in violation of Plaintiffs' exclusive rights under the Copyright Act, which actions constitute copyright infringement. Additionally, Defendants have committed unlawful and unfair business acts related to (i) filing knowingly false DMCA complaints against Plaintiffs' and Plaintiffs' licensees' digital sale and distribution of musical recordings, and (ii) the exhibition of videos on YouTube, including filing knowingly false DMCA complaints against videos posted by Plaintiffs, unlawfully taking possession of several YouTube channels created and populated by Plaintiffs, falsely claiming the recordings and videos as their own, and improperly collecting revenues derived from Plaintiffs' video content, all of the foregoing causing significant injury to Plaintiffs.

3. Plaintiffs seek recovery of all remedies available under the law, including, but not limited to, its damages, all of defendants' profits, and payment of Plaintiffs' attorneys fees and costs.

## JURISDICTION AND VENUE

4. This Court has federal question jurisdiction under 28 U.S.C. §§ 1331, and 1338(a) because this action arises under the laws of the United States and the controversy arises under the Copyright Act (17 U.S.C. §§ 101 *et seq.*).

5. This Court has supplemental jurisdiction over the related state claims herein under the provisions of 28 U.S.C. § 1367(a) in that said claims are joined with a substantial and related claim under the Copyright Act, 17 U.S.C. § 101 *et seq.* and that all claims form part of the same case and controversy under Article III of the United States Constitution.

6. This Court has personal jurisdiction over Defendants on the grounds that they reside in and/or are knowingly and purposely doing business in this State and District as all Defendants have purposefully availed themselves of the jurisdiction of this Court by transacting business and committing unlawful acts of infringement in this Judicial District and the State of California.

7. Venue in this judicial district is proper under 28 U.S.C. §§ 1391 because a substantial part of the events giving rise to these claims occurred and are occurring in this judicial district.

## PARTIES

8. Plaintiff Platino Records, Inc. ("Platino") is a corporation organized and existing under the law of the State of California with its principal place of business at 19201 Parthenia Street, Suite C, Northridge, California 91324.

9. Plaintiff Antoine Music, Inc. ("Antoine") is a corporation organized and existing under the law of the State of California with its principal place of business at 19792 Trammell Lane, Chatsworth, California 91311.

10. On information and belief, defendant Colonize Media, Inc. ("Colonize") is a corporation organized and existing under the law of the State of California with its principal place of business at 701 East Canal Drive, Turlock, California 95380.

11. On information and belief, defendant Yellowcake, Inc. is a corporation organized and existing under the law of the State of California with its principal place of business at 701 East Canal Drive, Turlock, California 95380.

12. On information and belief, defendant Jose David Hernandez ("Hernandez") is a U.S. citizen residing in Patterson, California.

13. On information and belief, defendant Kevin Berger ("Berger") is a U.S. citizen residing in California, having a business address at 701 East Canal Drive, Turlock, California 95380.

14. Defendants DOES 1 through 10, inclusive, are other parties not yet identified who have infringed Plaintiffs' copyrights, have contributed to the infringement of their

copyrights, have induced the infringement of their copyrights, or have otherwise engaged in one or more of the wrongful practices alleged herein. The true names, whether corporate, individual, or otherwise, of defendants DOES 1 through 10, inclusive, are presently unknown to Plaintiffs, who therefore sue said defendants by such fictitious names, and will seek leave to amend this Complaint to show their true names and capacities when ascertained.

15. Upon information and belief, at all times relevant hereto each of the individual Defendants was the agent, affiliate, officer, director, manager, principal, alter-ego, and/or employee of the remaining Defendants and was at all times acting within the scope of such agency, affiliation, alter-ego relationship and/or employment; and actively participated in or subsequently ratified and adopted, or both, each and all of the acts or conduct alleged, with full knowledge of all the facts and circumstances, including, but not limited to, full knowledge of each and every violation of Plaintiffs' rights and the damages to Plaintiffs proximately caused thereby.

### **FACTS COMMON TO ALL CLAIMS**

16. Plaintiff Platino is a music label specializing in music from Mexico and/or music performed by Mexican musicians and musical acts.

17. Since 1996, Platino has produced, authored and/or acquired musical sound recordings from a stable of musical acts and musicians, and has distributed such sound recordings as singles and/or albums (collectively, the "Platino Works") throughout the United States and abroad.

18. In or about 2013, Platino's owner, Mr. Alberto Mitchell, came to recognize that digital distribution of musical recordings represented a new and lucrative distribution method for monetizing the Platino Works, and so set about making plans for entering the digital distribution market.

19. On December 22, 2014, Defendant Hernandez formed a new corporation under the name DH1 Media Inc., later changing the name of such corporation to Colonize Media, Inc. in a filing with the California Secretary of State on February 2, 2016.

20. Initially, Platino entered into a written agreement with defendant Hernandez, dated August 15, 2013 (the "Hernandez Agreement"), whereby Hernandez would acquire fifty percent (50%) of the rights in those master recordings of those Platino Works created or acquired by Platino prior to 2008 (the "Pre-2008 Masters"), provided that Hernandez form a new corporation owned 50/50 with Alberto Mitchell's wife, Maria Mitchell.

21. On or about August 24, 2013, Platino assigned the remaining fifty percent (50%) of the rights in the Pre-2008 Masters to Plaintiff Antoine, which company is owned by Maria Mitchell. Attached hereto as Exhibit 1 is a true and correct copy of the list of Pre-2008 Masters owned by Antoine.

22. Thereafter, on September 11, 2013, Hernandez formed M-Gen Stream, Inc. ("M-Gen") with Maria Mitchell, each of them receiving fifty percent of the shares of stock therein and, on information and belief, the rights to sell and digitally transmit copies of the Pre-2008 Masters were then granted to M-Gen by Hernandez and Antoine.

23. M-Gen then entered into a written 5-year digital distribution agreement, dated September 30, 2013, with Hernandez' Richboy Ventures, Inc. d/b/a DH1 Digital ("RVI/DH1"), under which agreement RVI/DH1 retained a fifteen percent (15%) royalty based on the total revenues received from the sale or other uses of the Pre-2008 Masters, and the remaining sales revenues were paid to M-Gen (the "M-Gen License"). Shortly thereafter, RVI/DH1 undertook the digital distribution of the Pre-2008 Masters, and paid M-Gen the revenues as required under the agreement.

24. On February 10, 2016, Hernandez filed with the California Secretary of State a Certificate of Dissolution for RVI/DH1, signed on December 31, 2015, pursuant to which all assets and obligations of RVI/DH1 were assumed by Hernandez.

25. On information and belief, at some time following the formation of Colonize but prior to the dissolution of RVI/DH1, Colonize took over the digital distribution of the Pre-2008 Masters on behalf of M-Gen, although none of the Defendants notified Mrs. Mitchell or any of the Plaintiffs about this transition.

26. On March 16, 2017, M-Gen filed with the California Secretary of State (i) a Certificate of Election to Wind Up and Dissolve and (ii) a Certificate of Dissolution, each document signed by both Hernandez and Mrs. Mitchell and dated December 31, 2016.

27. As a result of the dissolution of both RVI/DH1 and M-Gen, the M-Gen License came to its conclusion, either on March 16, 2017, the date on which both parties to the agreement ceased to exist, or else at the end of the term on September 30, 2018.

28. Nonetheless, following the dissolution of M-Gen, Colonize continued to distribute the Pre-2008 Masters pursuant to an oral license having the same royalty terms as the M-Gen License, and Colonize continued to make payments directly to both of the M-Gen shareholders, such payments purportedly in equal amounts. Despite the absence of a written agreement, Colonize continued with its distribution activities in the same manner as before, providing monthly statements and payments from such activities.

29. In or about October 2013, Platino reached a similar licensing arrangement with Colonize to distribute the digital masters for the remainder of the Platino Works it solely owned (the "Platino Masters") whereby Colonize provided the same digital distribution services as contained in the M-Gen License in exchange for a royalty of twenty-five percent (25%) royalty. The agreement concerning the Platino Masters was an oral license, and Colonize provided a monthly statement and royalty payment to Platino from such distribution and sales activities. A list of the Platino Masters is attached hereto as Exhibit 2.

30. In addition to the digital distribution of the Platino Works, starting in 2013 Platino set out to create audiovisual works containing the Platino Works ("Video Content") with the intention of posting such Video Content on online channels, such as on YouTube. The Video Content was created subsequent to the signing of the M-Gen License and so is not directly covered by such agreement.

31. Since June 2015, Platino has created and owned several online music video channels on YouTube, including "Sabor Mexicano", "IKA Digital", "PMD - Platino Music Digital", "Coleccion Nortena", "Las Cazuelas Con Sabores de mi Tierra", "Mexico Tierral del Mariachi" and "DMY Los Plebeyos y Sus Amigos" (collectively, the "Platino

Channels"). The Platino Channels contain tens of thousands of video uploads, nearly 100,000 subscribers, and the combined content has had more than 75 million views.

32. As part of their 2013 oral agreement, Platino agreed to permit Colonize to manage the business aspects of the Platino Channels as part of Colonize's overall digital services, including working directly with all digital platforms, creating channels on YouTube, uploading the content provided by Platino onto the Platino Channels, and collecting the revenues generated from the distribution of the Video Content, and in exchange Colonize was to retain twenty-five percent (25%) of the online revenues generated by such Video Content. However, unlike the licenses for the digital masters, the oral agreement between Platino and Colonize concerning the Platino Channels contained no grant of rights to distribute or reproduce the Video Content or any other copyright rights or license in or to the Video Content.

33. On information and belief, Colonize sold, licensed or otherwise distributed the Platino Masters and Video Content through more than a dozen different stores and distribution channels, including (but not limited to): Alibaba; Amazon; Apple Music; Deezer; Google Music; Google Play; Google Trans; Google Locker; iHeartRadio; iTunes; KKBox; Napster; Pandora; Rhapsody; Saavn; Slacker; Soundcloud; Spotify; Tidal; UMA; Yandex; YouTube and YouTube AD (collectively, the "Distribution Channels").

34. In light of the successful digital distribution of the Platino Masters, Video Content and M-Gen catalog of recordings, Mr. Mitchell sought to replicate such success for other companies that he owned or with whom he had exclusive licensing relationships.

35. In 2014, Plaintiff Platino entered into an exclusive license with Distribuidora De Discos Monterrey, S.A. De C.V., a corporation organized and existing under the laws of Mexico ("DMY"), granting Platino the exclusive world-wide right and license to distribute, *inter alia*, the digital masters for the musical recordings set forth in the attached Exhibit 3 (the "DMY Masters"). In January 2014, Platino orally contracted with Colonize to digitally distribute the DMY Masters through the Distribution Channels at the same twenty-five percent (25%) royalty rate terms. DMY S.A de C.V. owns valid copyrights in the DMY

7
COMPLAINT

Masters, including without limitation all right, title and interest in the same, under the laws of Mexico as works created and published in Mexico.

36. In 2018, Plaintiff Platino entered into an exclusive license with IKA S.A de C.V., a corporation organized and existing under the laws of Mexico ("IKA"), granting Platino the exclusive world-wide right and license to distribute, *inter alia*, the digital masters for the musical recordings set forth in the attached Exhibit 4 (the "IKA Masters"). In November 2018, Platino orally contracted with Colonize to digitally distribute the IKA Masters through the Distribution Channels at the same twenty-five percent (25%) royalty rate terms. IKA S.A de C.V. owns valid copyrights in the IKA Masters, including without limitation all right, title and interest in the same, under the laws of Mexico as works created and published in Mexico.

37. In 2017, Plaintiff Platino entered into an exclusive license with Aggressive Digital LLC, granting Platino the exclusive world-wide right and license to distribute, *inter alia*, the digital masters of its catalog of musical recordings (the "Aggressive Masters"). In October 2017, Platino orally contracted with Colonize to distribute the Aggressive Masters through the same Distribution Channels and at the same twenty-five percent (25%) royalty rate terms. Subsequently, in February 2018, Platino acquired all right, title and interest in and to the Aggressive Masters and agreed to allow Colonize to continue in the distribution of the Aggressive Masters under the existing oral distribution agreement with Colonize. As a result of such acquisition, Platino is the owner by assignment of the valid copyrights in the Aggressive Masters, including without limitation all right, title and interest in the same, under the laws of Mexico as works created and published in Mexico. The list of Aggressive Masters is included within Exhibit 2.

38. As a result of these agreements, Colonize undertook the digital distribution of the DMY Masters, the IKA Masters, and the Aggressive Masters, alongside the Platino Masters and Video Content (collectively, the "Plaintiffs' Works") and paid Plaintiffs the revenues as required under their respective agreements.

39. Pursuant to their respective license agreements, Colonize made monthly payments to the Plaintiffs within fifteen days of the end of each month, such monthly payment corresponding to the sales made three (3) months prior (e.g., payments for sales in January of a given year were made in April of that same year). Monthly net revenues from the digital distribution of the Plaintiffs' Works and the Pre-2008 Masters was routinely between $80,000-120,000.

40. However, on October 14, 2019, during an in-person meeting with Mr. and Mrs. Mitchell held at the offices for Colonize, Defendants notified Plaintiffs that Colonize would cease making payments to Plaintiffs, despite their intention to continue with the distribution of the Plaintiffs' Works and the Pre-2008 Masters. At this meeting, Defendant Berger threatened Mr. and Mrs. Mitchell, telling them: (i) that by sending royalty money to Mexico they were engaging in money laundering for which they could go to jail; (ii) that they had committed a substantial amount of fraud (although providing no explanation as to what specific activities he was referring that would be fraudulent); and (iii) that he was very close with the district attorney and that with one phone call he could see that they went to jail. Berger went on to tell Mr. and Mrs. Mitchell that Defendants would clean up the problems and see that everything is taken care of, but only if they agreed to sell the remaining fifty percent (50%) ownership and rights in and to the Pre-2008 Masters for the sum of five hundred thousand dollars ($500,000), and if they refused, all payments to Plaintiffs would be stopped.

41. Plaintiffs refused to acquiesce to Defendants' demands to sell them the remaining rights in the Pre-2008 Masters, and Defendants ceased providing statements and ceased making payments after the October 14 meeting.

42. On October 30, 2019, the Plaintiffs notified Hernandez and Colonize that all of their respective license agreements concerning the distribution and sale of the Plaintiffs' Works were terminated effective immediately, due to Defendants' breach of such license agreements for failure to pay Plaintiffs their earned revenues.

43. However, despite the fact that these license agreement were terminated, Defendants continue to distribute Plaintiffs' digital masters and Video Content, without Plaintiffs' permission or consent.

## **FIRST CAUSE OF ACTION**

<u>Copyright Infringement Under 17 U.S.C. § 101 *et seq.*</u>

(Against All Defendants)

44. Plaintiffs repeat, re-allege and incorporate by reference in this paragraph the allegations set forth in Paragraphs 1 through 43, inclusive, and incorporate them by reference as though set forth fully herein.

45. Platino owns valid copyrights in the Platino Masters, the Aggressive Masters and the Video Content, including without limitation all right, title and interest in the same.

46. The DMY Masters and IKA Masters substantially consist of material wholly owned by DMY and IKA (respectively) and which are copyrightable subject matter under the laws of Mexico and the United States.

47. The DMY Masters, IKA Masters and Aggressive Masters were all first published in Mexico or elsewhere outside the United States, are therefore not considered to be United States Works and are not required to be first registered with the U.S. Copyright Office pursuant to 17 U.S.C. §411(a).

48. Nonetheless, several dozen of the Platino Masters, Video Content and DMY Masters have been registered with the United States Copyright Office. A list of the specific works registered (the "Registered Works") are attached hereto as Exhibit 5. In this lawsuit, Plaintiffs are only suing on the Registered Works and those works which are not considered United States works. Platino is currently in the process of filing registrations on additional works and will amend this complaint or file a new lawsuit on those works once registration is obtained.

49. The Registered Works substantially consist of material wholly original with Plaintiffs and which are copyrightable subject matter under the laws of the United States.

Platino has complied in all respects with the Copyright Act and all of the laws of the United States governing copyrights.

50. Defendants have infringed the Plaintiffs' Works, including without limitation the Video Content, in violation of the Copyright Act, 17 U.S.C. §§ 106 and 501. Such infringing conduct includes, but is not limited to, creating unauthorized reproductions of the Plaintiffs' Works, posting infringing copies of the Plaintiffs' Works, streaming infringing copies of the Plaintiffs' Works without license, permission or authority, selling copies of the Plaintiffs' Works without license, permission or authority, and distributing copies of the Plaintiffs' Works without license, permission or authority.

51. Each such infringement by each Defendant constitutes a separate and distinct act of infringement.

52. The Defendants have directly, vicariously, and/or contributorily infringed and, unless enjoined, will continue to infringe Plaintiffs' copyrights by the unauthorized reproduction, performance, sale and other distribution of the Plaintiffs' Works, in violation of 17 U.S.C. § 501 *et seq*.

53. Defendants have received substantial benefits in connection with the unauthorized acts undertaken in connection with the Plaintiffs' Works in their course of trade, profiting substantially.

54. All of these acts by the Defendants are and were performed without the permission, license, or consent of Plaintiffs.

55. As a direct and proximate result of Defendants' infringement, Plaintiffs are entitled to their actual damages in addition to Defendants' profits that are attributable to the infringement of the copyrighted material; alternatively, Plaintiffs are entitled to statutory damages for infringement in the maximum statutory amount allowed.

56. Furthermore, in acting as alleged above, Plaintiffs are informed and believe, and on that basis allege, that when Defendants took the actions complained of above, they did so knowing that these acts infringed Plaintiffs' copyrights and therefore Plaintiffs are

entitled to additional damages in an amount to be proven at trial for willful and knowing infringement, but in no event less than $150,000 for each registered work infringed.

57. Defendants threaten to continue to act as alleged above, and unless restrained and enjoined, will continue to do so, all to Plaintiffs' irreparable injury. The amount of compensation which would afford adequate relief to Plaintiffs for such injury will be difficult to ascertain. The wrongful acts of Defendants are of a continuing nature and will require a multiplicity of judicial proceedings. Accordingly, Plaintiffs remedy at law is inadequate, and Plaintiffs are entitled to preliminary and permanent injunctive relief to enjoin the wrongful conduct of Defendants alleged above.

## SECOND CAUSE OF ACTION

### Breach of Contract

(Against Colonize)

58. Plaintiffs repeat, re-allege and incorporate by reference in this paragraph the allegations set forth in Paragraphs 1 through 57, inclusive, and incorporate them by reference as though set forth fully herein.

59. Colonize breached its oral licenses with Plaintiffs by failing to pay Plaintiffs their share of the revenue earned from the sales and other exploitation of Plaintiffs' Works between July 1, 2019 and October 30, 2019 (the date Colonize license was terminated).

60. Colonize breached its written and oral licenses with Plaintiffs by substantially underreporting the actual sales and other earned revenues for the Plaintiffs' Works, misrepresenting the correct royalty amounts due to Plaintiffs each month, and thereby failing to pay Plaintiffs their share of the revenue earned from the sales and other exploitation of Plaintiffs' Works, from October 2013 up to and including June 30, 2019.

61. Plaintiffs have performed all obligations to Colonize required under the oral licenses except those obligations Plaintiffs were prevented or excused from performing due to Colonize's breaches.

62. As a result of Colonize's breach, Plaintiffs have been damaged in an amount to be proved at trial, but which is believed to exceed $3,000,000.00.

## THIRD CAUSE OF ACTION

<u>Misrepresentation Under 17 U.S.C. § 512(f)</u>

(Against All Defendants)

63. Plaintiffs repeat, re-allege and incorporate by reference in this paragraph the allegations set forth in Paragraphs 1 through 62, inclusive, and incorporate them by reference as though set forth fully herein.

64. Following the dissolution of M-Gen, all licenses granted by Antoine to M-Gen terminated and any rights gratned by Antoine to M-Gen reverted to Antoine leaving Antoine as owner of one half of 100% of the copyrights in the Pre-2008 Masters. As a joint owner of the copyrights in the Pre-2008 Masters, Antoine has the right to exercise all rights in the Pre-2008 Masters, including the reproduction, distribution and/or sale of such works, owing only a duty of accounting to theother copyright co-owner.

65. On information and belief, the only other joint owner of the copyrights in the Pre-2008 Masters is Hernandez.

66. On information and belief, Colonize has no ownership interest in or to the Pre-2008 Masters.

67. On information and belief, Colonize has no ownership interest in or to the Plaintiffs' Works, inclusive of the Video Content.

68. On information and belief, Yellowcake has no ownership interest in or to the Pre-2008 Masters.

69. On information and belief, Yellowcake has no ownership interest in or to the Plaintiffs' Works, inclusive of the Video Content.

70. In November 2019, Plaintiff Platino entered into an agreement with TANGO Multimedia Productions, LLC ("TANGO") for the exploitation, distribution, monetization and collection of the Plaintiffs' Works and Video Content.

71. Despite the fact that Colonize has no ownership of or license under the Plaintiffs' Works, Defendants have since December 2019 falsely claimed that the distribution by TANGO of the Plaintiffs' Works is "improper", despite Defendants having no ownership or other rights in the Plaintiffs' Works.

72. These claims by Defendant, as set forth in a December 3, 2019 letter from counsel for Defendants directed to Plaintiffs, were denied with specificity by Plaintiffs in a letter from their counsel dated December 5, 2019, wherein Plaintiffs explained in detail (i) that Defendants owned no rights in the Plaintiffs' Works, (ii) that Antoine was a joint owner of copyright in the Pre-2008 Masters and was lawfully entitled to exercise all of the rights granted under the Copyright Act, (iii) that any purported written license agreements had expired, (iv) that all oral licenses have been terminated, and (v) that any efforts to interfere with Plaintiffs' exploitation of the Plaintiffs' Works or the Pre-2008 Masters through digital distribution thereof would constitute tortious interference with business and contracts.

73. Despite placing Defendants on notice of the foregoing, Hernandez continued to insist that the Plaintiffs' Works were actually part of the Pre-2008 Masters and arguing that he had owned rights in them, despite the fact that none of the Plaintiffs Works were included in the Hernandez Agreement; in fact, substantially all of the Plaintiffs' Works were created after 2008 and fall outside of the scope of the Hernandez Agreement.

74. On information and belief, in December 2019, Defendant Hernandez sent Tango an e-mail communication wherein he asserted such false claims of ownership and/or rights in the Plaintiffs Works.

75. On information and belief, since December 2019, Defendants have submitted hundreds of invalid DMCA notices and claims against Plaintiffs and TANGO to multiple distribution channels, including Spotify and YouTube, misrepresenting Colonize or Yellowcake as the sole owner of copyright in the Plaintiffs' Works and the Pre-2008 Masters.

76. However, the true fact is that none of Plaintiffs' Works infringe any copyright owned by Colonize or Yellowcake.

77. On information and belief, Defendants knew that they had no copyright ownership in any of the Plaintiffs' Works and that the actions of TANGO in digitally distributing the Plaintiffs' Works were authorized by the copyright owners and did not infringe any of Defendants' copyrights on the date that they sent their DMCA complaints.

On information and belief, Defendants did not act with reasonable care or diligence before sending their DMCA complaints.

78. Defendants were aware, and would have had no substantial doubt had they been acting in good faith, that the Plaintiffs' Works did not infringe any of their copyrights on the dates they sent their DMCA complaints. On information and belief, Defendants were not acting in good faith while sending their DMCA complaints.

79. In light of the foregoing, Defendants violated 17 U.S.C. § 512(f) by knowingly and materially misrepresenting under that section that the Plaintiffs' Works and the Pre-2008 Masters infringed their copyrights.

80. Defendants, and each of them, by the deliberate filing of the bad-faith DMCA takedown requests, engaged in intentional tortious action.

81. As a direct and proximate result of Defendants' actions, Plaintiffs have suffered substantial injury. Such injury includes, but is not limited to, the financial and personal expenses associated with responding to Defendants' complaints to Spotify and to YouTube, the costs associated with retaining counsel to address the unlawful activities of Defendants, the harm to Plaintiffs' business relationship with its distributor TANGO, and the lost revenues, including advertising revenues (in an amount to be established at trial) that still continue to accrue because the Plaintiffs' Works and Pre-2008 Masters have been kept offline due to Defendants improper and bad faith DMCA takedown complaints.

## FOURTH CAUSE OF ACTION

Intentional Interference with Prospective Economic Relations

(Against All Defendants)

82. Plaintiffs repeat, re-allege and incorporate by reference in this paragraph the allegations set forth in Paragraphs 1 through 81, inclusive, and incorporate them by reference as though set forth fully herein.

83. Plaintiffs were in an economic relationship with YouTube that, if not impeded by Defendants, would have resulted in an economic benefit to Plaintiffs; specifically, that Plaintiffs' videos, including but not limited to the Video Content, attracted viewers to

Plaintiffs' YouTube channels. Advertisements would be placed on Plaintiffs' videos, including but not limited to the Video Content. The revenue derived from these advertisements would be split between YouTube and Plaintiffs.

84. Defendants knew of this economic relationship between Plaintiffs and YouTube and intended to disrupt it. Defendants engaged in wrongful conduct by, among other things, making themselves sole administrators for each channel, locking out Plaintiffs from control of their YouTube channels, advising YouTube to direct advertising revenues earned by Plaintiffs' video content to Colonize, sending harassing correspondence to Plaintiffs and TANGO threatening legal action should Plaintiffs not remove their videos, and filing multiple fraudulent DMCA takedown notices.

85. Plaintiffs' relationship with YouTube with regard to their video channels was disrupted when YouTube agreed to block Plaintiffs' posting of videos in new YouTube channels and to cease payments of advertising revenues to Plaintiffs for advertisements placed on the existing Video Content on those channels improperly seized by Defendants. This deprived Plaintiffs of the revenue that they could have earned through the placement of advertisements on Plaintiffs' videos. Plaintiffs were damaged as a result of the disruption of this relationship in an amount to be proven at trial. Defendants' wrongful conduct was a substantial factor in causing this harm to Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter judgment in their favor on each and every claim for relief set forth above and award it relief including, but not limited to, an Order:

1. Enjoining Defendants, their officers, employees, agents, subsidiaries, representatives, distributors, dealers, members, affiliates, and all persons acting in concert or participation with them from: (i) infringing Plaintiffs' copyrighted works; (ii) inducing or contributing to third party infringements of Plaintiffs' copyrighted works; (iii) sending false

DMCA notices to YouTube and other online video providers; and (iv) intentionally interfering with Plaintiffs' contracts with third parties;

2. Requiring Defendants to provide Plaintiffs with an accounting of any and all licensing and/or sales of products or services that infringe or violate any of their rights described herein;

3. Awarding Plaintiffs monetary relief including damages sustained by Plaintiffs in an amount not yet determined, including actual or statutory damages for copyright infringement under 17 U.S.C. § 504 and other applicable laws as appropriate;

4. Awarding Plaintiffs damages for the lost revenue incurred as a result of Defendants' sending false DMCA notices;

5. Awarding Plaintiffs their costs and attorneys' fees in this action pursuant to 17 U.S.C. § 505 and other applicable laws; and

6. Awarding such other and further relief as this Court may deem just and appropriate.

Dated: April 3, 2020                    Law Offices of Larry Zerner

By: _____
Larry Zerner
Attorney for Plaintiffs

DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demands trial by jury of all issues so triable in the present action.

Dated: April 3, 2020                    Law Offices of Larry Zerner

By: _____
Larry Zerner
Attorney for Plaintiffs